1

2

3

4

5

6

7

8          **IN THE UNITED STATES DISTRICT COURT**

9          **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11    CHRISTOPHER JAMES LYNOTT,           No. CIV S-06-0595-MCE-CMK-P

12              Petitioner,

13         vs.                            FINDINGS AND RECOMMENDATIONS

14    TOM CAREY, Warden,

15              Respondent.

16    _____/

17              Petitioner, a state prisoner proceeding with counsel, brings this petition for a writ

18    of habeas corpus pursuant to 28 U.S.C. § 2254.  Pending before the court is petitioner's

19    [amended] petition for a writ of habeas corpus (Docs. 1 & 3), filed on March 21, 2006,

20    respondent's answer (Doc. 10), filed on July 5, 2006, and petitioner's reply (Doc. 11), filed on

21    July 11, 2006.

22    / / /

23    / / /

24    / / /

25    / / /

26    / / /

1

# I.  BACKGROUND

A.      **Facts**[1]

The state court recited the following facts, and petitioner has not offered any clear

and convincing evidence to rebut the presumption that these facts are correct:

*The Prosecution Case*
Defendant and his neighbor, William Hartig, had a cordial
relationship until a dispute arose between them over Hartig's plans to
build a house on his property in Blue Canyon.  Defendant, who worked
part time for a structural and civil engineering firm, claimed that Hartig
did not have the permits needed to start construction.
Hartig hired Champion Contractors and Richard Hawkins to pour
the cement footings for the new house.  Hartig was at the construction site
between 4:30 a.m. and 5:00 a.m. on July 28, 2001.  Harlan Hamby, an
employee of Interstate Concrete Pumping, arrived to deliver concrete
between 6:00 a.m. and 6:15 a.m., while it was still dark.  Defendant
approached Hamby in a state of agitation and said, "You are not pouring
today."  Defendant claimed he had "red flagged" the project and pulled the
building permit.  Hamby explained that he was not the "big cheese," and
the defendant began to calm down.  However, when other crew members
arrived, defendant yelled and screamed, accusing them of "bootlegging
concrete."  Hartig attempted to talk with defendant.
Cement contractor Hawkins, who was a large man, entered the
discussion and said, "[T]his is bull crap.  We're going to pour concrete."
He tried to stand his ground because there was a lot of money involved in
the work scheduled that day.  Hawkins suggested that defendant and
Hartig work out their differences later through the permit process.
Defendant responded, "[Y]ou are not that big.  I've took [sic] guys bigger
than you before."  Defendant said he could have five guys there in 30
minutes to take care of all of them.  He warned, "[Y]ou don't know who
you are messing with.  You don't know who I'm associated with."
According to Christopher Mulock, one of Hawkins's workers,
defendant said that he was going to get people to "come over and take care
of us" and threatened to "shoot [our] asses if [he had] to."  Hartig
recounted similar threats.  At least twice, defendant said, "[D]o you have
any idea what organization I belong to?  Do you have a clue what
organization I belong to?  You are so fucked.  You are from the Bay Area.
Do you know what [the] number four means in the Bay Area?"  Defendant
took his four fingers, pointed them down to the ground, cursed Hartig
again, and walked away.

---

[1]      Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made
by a State court shall be presumed to be correct."  Petitioner bears the burden of rebutting this
presumption by clear and convincing evidence.  See id.  These facts are, therefore, drawn from
the state court's opinion(s), lodged in this court.  Petitioner may also be referred to as
"defendant."

1
2

The rest of Hawkins's crew arrived and poured 150 yards of concrete that morning.  Around 9:00 a.m., Hawkins saw two men drive up to defendant's house in a white truck.  The men had a 12-pack of beer and carried open beers in their hands.

3
4
5
6

Most of the crew, including Hawkins, took a break up the hill from the work site around 10:00 a.m., approximately four hours after the verbal confrontation with defendant.  Hartig, Hamby, Mulock, and Dean Earing remained in the foundation hole.  During the break, all of the men heard between four and 20 shots fired.  Hawkins saw tree boughs fall on the crew.  The weapon was not in the crew's line of sight, but the bullets struck the trees 15 to 20 feet above them.  Hawkins testified the shooter "did a really good job" of scaring them.

7
8
9

The four men then came out of the foundation hole, walked up the road past the entrance to defendant's driveway, and joined the rest of the crew.  Hamby, Earing, and Mulock saw defendant standing with one or two other men, and testified he was holding a rifle.  Mulock saw defendant fire the gun in the air.

10
11

Hawkins called the sheriff's department, and Deputy Sheriff Jack Houser responded.  Houser had known defendant for some time, was familiar with the property, and was aware that defendant had a felony record.  Deputy Sheriff Ryan Owens and California Highway Patrol Officer Chris Worster already were at the scene when Houser arrived.

12
13
14
15

Deputy Houser asked dispatch to telephone defendant's house.  Defendant then came outside accompanied by Christopher Klitgaard.  Defendant told Houser that he confronted the foreman and questioned the permits when the machinery awakened him earlier in the day.  He denied shooting a gun and suggested that local kids had done it.  Klitgaard volunteered that he had fired the gun and concealed it in the house.  Houser warned Klitgaard that he might be subject to criminal prosecution.

16
17

Defendant's wife, Pamela, came out of the house and told Deputy Houser that she heard shots from the laundry room but did not see anyone fire a gun.  At Houser's request, she went back inside and retrieved a .44-magnum lever-action carbine from under the living room couch.  John Feurstenberger came out of the house with her.

18
19

Once Deputy Houser learned from witnesses that defendant had been in possession of the rifle, he placed him under arrest.  Houser searched unsuccessfully for spent cartridges.  There were no usable fingerprints on the rifle.

20

*The Defense Case*

21

Both defendant and his wife, Pamela, testified at trial.

22

Pamela said that she was awakened at 4:47 a.m. on July 28, 2001, by the headlights of what she assumed was a logging truck.  She found defendant on the couch where he had gone to sleep watching television.

23
24
25

Defendant and Pamela went outside and saw Hartig emerging from the entrance to the construction pit.  When defendant asked what he was doing, Hartig replied he was going to pour a foundation.  Defendant challenged Hartig's right to proceed, citing a correction notice dated 10 days earlier that had not been corrected.

26    / / /

3

According to Pamela, Hawkins told them he had no permits, he did not need one, and he planned to pour the concrete whether they liked it or not. Hawkins stepped forward as if to bully defendant, and defendant became agitated for the first time. He told Hawkins, "[Y]ou don't know who I am or who I work with. I know practically everybody in the county." He made to reference to the number four.

Defendant and his wife then returned to the house. Pamela wanted to call the sheriff's department, but she and defendant decided it best to deal with the situation the following Monday. Defendant knew the sheriff would not get involved in a dispute over a building permit. Pamela started doing laundry and defendant went back to sleep. The couple planned to go to the Boomtown buffet or the swap meet at Denio's with Klitgaard and Feurstenberger later in the day.

Klitgaard and Feurstenberger arrived at defendant's home between 9:00 a.m. and 9:30 a.m. They spoke with defendant and Pamela for about 20 minutes. At that point, they went outside to smoke while Pamela continued with household chores and defendant took a shower. Klitgaard often went to garage sales, flea markets, and swap meets. He brought with him a rifle that he had recently purchased. Defendant and Pamela were still busy, so Klitgaard retrieved the rifle from his car and loaded it for target practice. Klitgaard put seven rounds in the magazine and one in the chamber. He fired over an abandoned house at some trees. Hawkins's crew was approximately 90 degrees to the right of where he fired.

Feurstenberger was standing next to Klitgaard when he fired the rifle. The cartridge door jammed after the first round. Klitgaard fixed the jam with a screwdriver supplied by defendant, and fired off the rest of the rounds. Not wanting to damage the firearm more, Klitgaard left it on the porch ant went inside. When the sheriff's deputies arrived and asked defendant to come outside, Klitgaard brought the rifle into the house and put it under the couch.

Defendant and Pamela heard the shots from inside the house. Defendant went outside when his friends called him, and he showed them where he kept his tools. Defendant denied handling the gun. He testified that in order to protect his friends, he told Deputy Houser that kids must have done the shooting.

Roger Dunscombe, a neighbor of defendant, testified he was at home when the heavy equipment arrived. Later in the morning, he heard shooting and looked outside. He saw two men, one holding a gun pointed at the trees. Neither of the men was defendant.

*Prosecution Rebuttal*

Deputy Houser testified regarding statements made to him by Feurstenberger and Klitgaard. Feurstenberger said that he was not the person who shot the rifle, that he heard the shots, but that he did not see who possessed the gun or fired it. Klitgaard said that he hid the gun under the couch because "he didn't want [defendant] to get in trouble."

An investigator from the Placer County District Attorney's Office testified that he interviewed Klitgaard, who admitted firing the gun while defendant and Feurstenberger were watching. Klitgaard also said that defendant got the screwdriver to fix the gun.

1    **B.      Procedural History**

2         Petitioner was convicted following a jury trial of: three counts of threatening to

3    commit a crime resulting in death or great bodily injury on Christopher Mulock, William Hartig,

4    and Richard Hawking; one count of being a felon in possession of a firearm; and one count of

5    discharging a firearm with gross negligence. The jury also found true the allegation that

6    petitioner had used a firearm in the commission of the offenses. Petitioner was sentenced to 14

7    years and 4 months in state prison.

8         On direct appeal, petitioner argued: (1) there was insufficient evidence to show

9    that he had used a firearm in the commission of the criminal threats; (2) the prosecutor

10   committed misconduct by informing the jury that petitioner had previously been convicted of

11   assault; (3) the trial court improperly excluded evidence of the caliber of bullets recovered by

12   defense investigators; (4) consecutive sentencing violated California law; and (5) the

13   enhancement must be stricken. The conviction and sentence were affirmed in a decision issued

14   on February 9, 2005. The California Supreme Court denied review without citation or comment

15   on May 18, 2005. On March 9, 2005, petitioner filed a petition for a writ of habeas corpus in the

16   California Supreme Court, arguing ineffective assistance of trial counsel. That petition was

17   denied without comment or citation on February 22, 2006.

18

19                              **II. STANDARDS OF REVIEW**

20         Because this action was filed after April 26, 1996, the provisions of the

21   Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively

22   applicable. See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct.

23   (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998). The AEDPA

24   does not, however, apply in all circumstances. For instance, when the state court reaches a

25   decision on the merits, but provides no reasoning to support its conclusion, a federal habeas court

26   independently reviews the record to determine whether the state court clearly erred in its

1   application of Supreme Court law.  See Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000).

2   Similarly, when it is clear that a state court has not reached the merits of a petitioner's claim,

3   because it was not raised in state court or because the court denied it on procedural grounds, the

4   AEDPA deference scheme does not apply and a federal habeas court must review the claim de

5   novo.  See Pirtle v. Morgan, 313 F.3d 1160 (9th Cir. 2002) (holding that the AEDPA did not

6   apply where Washington Supreme Court refused to reach petitioner's claim under its "relitigation

7   rule"); see also Killian v. Poole, 282 F.3d 1204, 1208 (9th Cir. 2002) (holding that, where the

8   state court denied petitioner an evidentiary hearing on perjury claim, AEDPA did not apply

9   because evidence of the perjury was adduced only at the evidentiary hearing in federal court);

10  Appel v. Horn, 250 F.3d 203, 210 (3d Cir.2001) (reviewing petition de novo where state court

11  had issued a ruling on the merits of a related claim, but not the claim alleged by petitioner).

12  When the state court does not reach the merits of a claim,  "concerns about comity and

13  federalism . . . do not exist."  Pirtle, 313 F. 3d at 1167.

14          Where the AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d)

15  is not available for any claim decided on the merits in state court proceedings unless the state

16  court's adjudication of the claim:

17          (1) resulted in a decision that was contrary to, or involved an
        unreasonable application of, clearly established Federal law, as determined
18      by the Supreme Court of the United States; or

19          (2) resulted in a decision that was based on an unreasonable
        determination of the facts in light of the evidence presented in the State
20      court proceeding.

21  28 U.S.C. § 2254(d); see also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Lockhart v.

22  Terhune, 250 F. 3d 1223, 1229 (9th Cir. 2001).

23          Under § 2254(d), federal habeas relief is available where the state court's decision

24  is "contrary to" or represents an "unreasonable application of" clearly established law.  In

25  Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a majority of the

26  Court), the United States Supreme Court explained these different standards.  A state court

1   decision is "contrary to" Supreme Court precedent if it is opposite to that reached by the Supreme

2   Court on the same question of law, or if the state court decides the case differently than the

3   Supreme Court has on a set of materially indistinguishable facts.  See id. at 405.  A state court

4   decision is also "contrary to" established law if it applies a rule which contradicts the governing

5   law set forth in Supreme Court cases.  See id.  In sum, the petitioner must demonstrate that

6   Supreme Court precedent requires a contrary outcome because the state court applied the wrong

7   legal rules.  Thus, a state court decision applying the correct legal rule from Supreme Court cases

8   to the facts of a particular case is not reviewed under the "contrary to" standard.  See id. at 406.

9   If a state court decision is "contrary to" clearly established law, it is reviewed to determine first

10  whether it resulted in constitutional error.  See Benn v. Lambert, 293 F.3d 1040, 1052 n.6 (9th

11  Cir. 2002).  If so, the next question is whether such error was structural, in which case federal

12  habeas relief is warranted.  See id.  If the error was not structural, the final question is whether

13  the error had a substantial and injurious effect on the verdict, or was harmless.  See id.

14          A state court decision is reviewed under the far more deferential "unreasonable

15  application of" standard where it identifies the correct legal rule from Supreme Court cases, but

16  unreasonably applies the rule to the facts of a particular case.  See id.; see also Wiggins v. Smith,

17  123 S.Ct. 252 (2003).  While declining to rule on the issue, the Supreme Court in Williams,

18  suggested that federal habeas relief may be available under this standard where the state court

19  either unreasonably extends a legal principle to a new context where it should not apply, or

20  unreasonably refuses to extend that principle to a new context where it should apply.  See

21  Williams, 529 U.S. at 408-09.  The Supreme Court has, however, made it clear that a state court

22  decision is not an "unreasonable application of" controlling law simply because it is an erroneous

23  or incorrect application of federal law.  See id. at 410; see also Lockyer v. Andrade, 123 S.Ct.

24  1166, 1175 (2003).  An "unreasonable application of" controlling law cannot be found even

25  where the federal habeas court concludes that the state court decision is clearly erroneous.  See

26  Lockyer, 123 S.Ct. at 1175.  This is because ". . . the gloss of clear error fails to give proper

1   deference to state courts by conflating error (even clear error) with unreasonableness." Id.  As

2   with state court decisions which are "contrary to" established federal law, where a state court

3   decision is an "unreasonable application of" controlling law, federal habeas relief is nonetheless

4   unavailable if the error was non-structural and harmless.  See Benn, 283 F.3d at 1052 n.6.

5

6                                   **III.  DISCUSSION**

7              In his petition, which was filed with the assistance of counsel, petition raises the

8   following claims:

9              I.  The firearm use enhancements must be reversed because the record
              contains insufficient evidence of a connection between the verbal threats
10             and the possession or discharge of the rifle, and therefore insufficient
              evidence that a firearm was used in the commission of threats of violence;

11
              II.  The prosecutor committed prejudicial misconduct by eliciting
12             petitioner's admission to a prior assault conviction on cross-examination;

13             III.  The state trial court improperly excluded evidence of the caliber of
              bullets recovered by defense investigators; and

14
              IV.  Petitioner was denied effective assistance of counsel for failure of
15             defense counsel to obtain expert ballistics analysis of the slugs taken from
              trees near petitioner's property, which would have demonstrated that the
16             slugs were fired from Klitgaard's gun, corroborating petitioner's testimony
              and undermining the testimony of prosecution witnesses.

17

18   Respondent concedes these claims are exhausted.  The court will address first petitioner's claims

19   (III and IV) relating to the underlying offense of making criminal threats.  The court will then

20   address petitioner's claim (I and II) concerning enhancements.

21       **A.       Exclusion of Evidence**

22             A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of a

23   transgression of federal law binding on the state courts.  See Middleton v. Cupp, 768 F.2d 1083,

24   1085 (9th Cir. 1985); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  It is not

25   available for alleged error in the interpretation or application of state law.  Middleton, 768 F.2d at

26   1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786

1  F.2d 1378, 1381 (9th Cir. 1986).  Habeas corpus cannot be utilized to try state issues de novo.

2  See Milton v. Wainwright, 407 U.S. 371, 377 (1972).

3         However, a "claim of error based upon a right not specifically guaranteed by the

4  Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so

5  infects the entire trial that the resulting conviction violates the defendant's right to due process."

6  Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th

7  Cir. 1980)); see also Lisenba v. California, 314 U.S. 219, 236 (1941).  Because federal habeas

8  relief does not lie for state law errors, a state court's evidentiary ruling is grounds for federal

9  habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due

10 process.  See Drayden v. White, 232 F.3d 704, 710 (9th Cir. 2000); Spivey v. Rocha, 194 F.3d

11 971, 977-78 (9th Cir. 1999); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991); see

12 also Hamilton v. Vasquez, 17 F.3d 1149, 1159 (9th Cir. 1994).   In order to raise such a claim in

13 a federal habeas corpus petition, the "error alleged must have resulted in a complete miscarriage

14 of justice."  Hill v. United States, 368 U.S. 424, 428 (1962); Crisafi v. Oliver, 396 F.2d 293, 294-

15 95 (9th Cir. 1968); Chavez v. Dickson, 280 F.2d 727, 736 (9th Cir. 1960).

16         Petitioner claims that the trial court erred by excluding evidence of the caliber of

17 bullets recovered by defense investigators.  As to this claim, the state court stated:

18            We turn now to defendant's claim that the trial court erred in
   excluding defense evidence regarding the caliber of a bullet recovered
19   from trees near defendant's house.
             In November 2002, 16 months after the incident, defense
20 investigator Lowell Carlton retrieved a rifle slug from a tree near
   defendant's house at a location consistent with defense testimony.  When
21 defense counsel attempted to elicit testimony on the caliber of the slug, the
   prosecutor objected for lack of foundation, based on the failure to show
22 Carlton "ha[d] the ability to look at a bullet and tell you what caliber it is
   based on that."  According to the prosecutor, "it only becomes relevant if
23 he can say this came out of the gun here, and I have seen no foundation for
   the ballistics of that, either."
24            The court sustained the objection because the defense had not
   disclosed Carlton as an expert before trial.  Thereafter, the court admitted
25 the bullet into evidence for the limited purpose of showing that Carlton
   dug it out of the tree.
26

1          Defense investigator Gary Holden testified that in May 2002 he
    watched defendant take bullets out of the tree "that [had been] shot at."
2   The court refused to allow those bullets to be introduced into evidence
    because "there [was] not a sufficient foundation in the record to provide a
3   nexus that those slugs [were] from the gun in question or shot on the day
    in question."
4          Defendant argues the trial court improperly excluded Carlton's
    testimony about the caliber of the bullet he found.  Asserting that
5   exclusion of this testimony was not an appropriate sanction for violation of
    reciprocal discovery in the circumstances of this case, defendant contends
6   that the ruling violated his right to due process.

7   In concluding that the trial court did not err, the state court stated:

8          "We review the correctness of the challenged ruling, not . . . the
    analysis used to reach it" . . . and conclude the court did not err in
9   excluding Carlton's testimony.

10         * * *

11         Defendant is correct that violation of the reciprocal discovery
    statutes does not ordinarily warrant exclusion of testimony at trial.
12  (citations omitted).  However, Carlton's testimony was properly excluded
    on the ground articulated by the prosecutor, lack of foundation.  Carlton
13  acknowledged he could only estimate the caliber of the bullet.  He
    indicated his knowledge came from 30 years of investigative experience
14  with the sheriff's department.  The defense's failure to link the bullet that
    Carlton found with the rifle used in the shooting 16 months earlier
15  justified exclusion of the testimony.  Lacking that foundation, his
    testimony on the caliber of the bullet was not admissible.

16

17  As to the correct standard of review, it is not clear that the state court addressed the due process

18  aspect of this claim.  While it could be argued that, because the state court concluded that

19  exclusion of the evidence was proper under state law, it necessarily could not have amounted to a

20  fundamental miscarriage of justice, nowhere in the state court's decision does the court conclude

21  that petitioner's due process rights were not violated.  Therefore, this court will review de novo

22  to determine whether constitutional error has occurred.

23         Petitioner claims that his due process rights were violated because exclusion of

24  Carlton's caliber testimony "was a prejudicial violation of petitioner's right to present evidence

25  in his own behalf."  Specifically, petitioner asserts that his ability to present a defense was

26  / / /

1   prejudiced by the ruling because:

2               The testimony . . . that the caliber of the recovered slugs matched
3       the caliber of Klitgaards's gun would have greatly bolstered the defense
        claim that these were the bullets fired on July 28, 2001.  This information
4       would have altered the balance of credibility between defense and
        prosecution witnesses.  It would have helped demonstrate that the gun was
5       fired in a direction away from the construction crew.  This would have
        corroborated the defense witnesses, and contradicted the prosecution
6       witnesses, and thus would have helped demonstrate that petitioner had no
        direct hand in the firing of the gun.

7   The court disagrees.  As the state court observed, there was absolutely no link between the bullet

8   found by Carlton with the rifle used in the shooting.[2]   Absent such a link, Carlton's testimony

9   would not have helped petitioner's case in the way he claims.  Petitioner's version of events is

10  that Klitgaard fired the shots from the rifle.  At best, however, Carlton's testimony would only

11  establish that there was at least one .44 caliber bullet in the tree where Carlton found the bullet.

12  Even if it were stipulated that the bullet Carlton found came from the gun fired on the date of the

13  incident, it would not establish who fired the shots, the critical issue.  Therefore, the testimony

14  would not have bolstered petitioner's position that he did not fire the gun.

15              As to petitioner's contention that Carlton's testimony would have helped establish

16  that the shots were fired away from the construction crew, the court does not agree.  Again, at

17  best, the testimony could have established that, indeed, a shot was fired in the direction of the

18  tree where Carlton found the bullet.  However, that does not establish that shots were not also

19  fired in the direction indicated by prosecution witnesses.

20              Moreover, as to petitioner's contention that Klitgaard was the shooter, during the

21  prosecution rebuttal case, Feurstenberger said that he was not the shooter, that he only heard the

22  shots but did not see who fired them.  In addition, during the defense case-in-chief, petitioner

23  testified that he was not present when the gun was fired but only heard the shots from inside the

24  house.  However, Klitgaard testified that he was standing with petitioner and Feurstenberger on

25  _____

26          [2]     Petitioner is incorrect when he states that the state court "pointed out that the
    bullet was not positively linked to Klitgaard's gun."

1  the porch when the shots were fired.  This directly contradicts Feurstenberger's and petitioner's

2  testimony that they did not see who fired the shots.  Carlton's testimony to the effect that a bullet

3  was found in a tree in a direction away from the construction crew would not have rehabilitated

4  the inconsistent testimony.

5        Finally, the record is clear that, even though Carlton's testimony was not allowed,

6  petitioner was nonetheless able to present his defense that he was not the shooter.  Both Klitgaard

7  and Feurstenberger testified.  In addition, petitioner and his wife testified.  Through all this

8  testimony, petitioner had ample opportunity to present his defense.

9        For all of these reasons, the court finds that petitioner was not denied the ability to

10 present his defense by exclusion of Carlton's testimony.  Therefore, petitioner's due process

11 rights were not violated in this regard.

12       **B.      Ineffective Assistance of Counsel**

13       The Sixth Amendment guarantees the effective assistance of counsel.  The United

14 States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in

15 Strickland v. Washington, 466 U.S. 668 (1984).  First, a petitioner must show that, considering

16 all the circumstances, counsel's performance fell below an objective standard of reasonableness.

17 See id. at 688.  To this end, petitioner must identify the acts or omissions that are alleged not to

18 have been the result of reasonable professional judgment.  See id. at 690.  The federal court must

19 then determine whether, in light of all the circumstances, the identified acts or omissions were

20 outside the wide range of professional competent assistance.  See id.  In making this

21 determination, however, there is a strong presumption "that counsel's conduct was within the

22 wide range of reasonable assistance, and that he exercised acceptable professional judgment in all

23 significant decisions made."  Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing

24 Strickland, 466 U.S. at 689).

25 / / /

26 / / /

1    Second, a petitioner must affirmatively prove prejudice.  See Strickland, 466 U.S.

2   at 693.  Prejudice is found where "there is a reasonable probability that, but for counsel's

3   unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A

4   reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.;

5   see also Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000).  A reviewing court "need not

6   determine whether counsel's performance was deficient before examining the prejudice suffered

7   by the defendant as a result of the alleged deficiencies . . . If it is easier to dispose of an

8   ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be

9   followed."  Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at

10   697).

11    As to the proper standard of review under AEDPA, this claim was raised in

12   petitioner's state habeas petition.  The state court, however, did not issue a reasoned opinion when

13   it denied this claim.  Rather, it denied without comment or citation.  Therefore, the court will

14   review under the de novo standard most favorable to petitioner.  See Delgado, 223 F.3d at 982.

15    Petitioner claims that his trial counsel was ineffective because he failed to obtain

16   expert ballistics analysis.  In response to this claim, respondent's argument, in its entirety, is:

17    As to the related claim of ineffectiveness for not testing the bullets
     to meet the foundational objection, this must be judged under the familiar

18   Strickland standard.  Under this test, petitioner must show both that
     counsel's conduct fell below an objective standard of reasonableness and

19   that petitioner was prejudiced by counsel's conduct.  Strickland v.
     Washington, 466 U.S. 668, 687 (1984).  Petitioner cannot meet the heavy

20   burden imposed by Strickland.  The independent evidence of petitioner's
     guilt of the charged offenses was strong.  He had motive to shoot at the

21   victims to stop their work and had threatened to shoot them before the shots
     were fired.  The victims also testified to seeing petitioner with the weapon

22   in question.  Petitioner's main defense was that he did not possess or shoot
     the weapon at all, the direction of the bullets was not crucial to the case.

23

24   The court agrees with respondent that there is no prejudice.  Petitioner argues that ballistics

25   analysis would have established a link between the slugs recovered from the scene and Klitgaard's

26   gun.  Even so, ballistics analysis would not have established who fired the gun, which is the

13

1   critical question.  Petitioner also contends that ballistics analysis would have shown that the gun

2   was fired in a different direction than described by prosecution witnesses.  However, as discussed

3   above, while such an analysis might have established that the gun was fired in a different

4   direction, it would not have established that the gun was not also fired in the direction of the

5   construction crew.  Given the inconsistencies in the testimony of defense witnesses (as discussed

6   above), the victims' testimony that they saw petitioner holding the rifle, and the lack of probative

7   value to ballistics analysis, the court finds that petitioner was not prejudiced and, therefore, did

8   not receive ineffective assistance of counsel.

9          **C.      Prosecutorial Misconduct**

10               Success on a claim of prosecutorial misconduct requires a showing that the

11  conduct so infected the trial with unfairness as to make the resulting conviction a denial of due

12  process.  See Greer v. Miller, 483 U.S. 756, 765 (1987).  The conduct must be examined to

13  determine "whether, considered in the context of the entire trial, that conduct appears likely to

14  have affected the jury's discharge of its duty to judge the evidence fairly."  United States v.

15  Simtob, 901 F.2d 799, 806 (9th Cir. 1990).   Even if an error of constitutional magnitude is

16  determined, such error is considered harmless if the court, after reviewing the entire trial record,

17  concludes that the alleged error did not have a "substantial and injurious effect or influence in

18  determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 638 (1993).  Error is

19  deemed harmless unless it "is of such a character that its natural effect is to prejudice a litigant's

20  substantial rights."  Kotteakos v. United States, 328 U.S. 750, 760-761 (1946).  Depending on the

21  case, a prompt and effective admonishment of counsel or curative instruction from the trial judge

22  may effectively "neutralize the damage" from the prosecutor's error.  United States v.

23  Weitzenhoff, 35 F.3d 1275, 1291 (9th Cir. 1993) (citing Simtob, 901 F.2d at  806).

24  / / /

25  / / /

26  / / /

1        Petitioner claims that the prosecutor engaged in misconduct by attempting to get

2   him to admit to a prior assault conviction on cross-examination.  As to this claim, the state court

3   stated:

4            We begin with defendant's contention that the prosecutor
         committed prejudicial misconduct during cross-examination of defendant
5        by trying to elicit evidence concerning the nature of his prior felony
         conviction.
6            Among other things, defendant was charged with having a prior
         conviction for a serious or violent felony, namely, a violation of [California
7        Penal Code] section 245(a)(1), assault with a deadly weapon or instrument
         other than a firearm or by means likely to produce great bodily injury.  He
8        also was charged with being a convicted felon in possession of a firearm.
         (citation omitted).
9            Before trial, the parties stipulated that "defendant will admit the
         prior alleged against him in the Information" and "admit that he . . .
10       therefore may not possess a firearm under California law."  Defendant
         agreed to the stipulation on the condition that, if convicted, he "retain[ed]
11       the right" to ask the court to strike the prior conviction finding for purposes
         of sentencing.  Out of the jury's presence, defendant waived his rights with
12       respect to the felony conviction allegation and admitted that "on or about
         October 14, 1987, [he was] convicted of a 245(a)(1) violation of the Penal
13       Code as a strike[.]"
             During cross-examination before the jury, defendant admitted he
14       was a convicted felon.  The prosecutor then asked defendant if the "charge
         [he was] convicted of in 1987 was assault with a deadly weapon."  Defense
15       counsel objected before defendant answered.  The court sustained the
         objection.  When the prosecutor stated, "I do not believe that piece of
16       evidence was excluded for purposes of impeachment," the court responded,
         "Sustained.  Stricken."  Later, the jurors were instructed as follows:
17       "Statements made by the attorneys during the trial are not evidence. . . . [¶]
         If an objection was sustained to a question don't guess what the answer
18       might have been. . . . [¶] Don't assume to be true any insinuation suggested
         by a question asked a witness. [¶] . . . [¶] Don't consider for any purpose . .
19       . any evidence that was stricken by the Court.  Treat [it] as though you had
         never hear of it."

20

21   The court began its analysis by concluding that it agreed with petitioner's interpretation of the

22   stipulation.  Specifically, the state court stated that "the only reasonable interpretation of the

23   stipulation is that the nature of the conviction [for felony assault with a deadly weapon] would not

24   be revealed to the jury for any reason."  The court, however, concluded that reversal was not

25   / / /

26   / / /

1  required:

2          To prevail on his claim of prosecutorial misconduct, defendant must
   show that it is reasonably probable a result more favorable to him would
3  have occurred absent the prosecutor's question. (citations omitted).  His
   argument in this respect is unconvincing.
4          According to defendant, the question conveyed to the jurors that he
   had been convicted of assault with a deadly weapon in 1987, which was
5  almost 14 years before the events at issue in this case.  But defendant never
   answered the question, and the trial court not only struck the question but
6  later (1) instructed the jurors that questions are not evidence, (2)
   admonished them not to guess what an answer might have been if an
7  objection was sustained, (3) told them not to assume to be true any
   insinuation suggested by a question, and (4) directed them not to consider
8  for any purpose any evidence that was stricken by the court.  We presume
   the jurors followed these instructions. (citation omitted).
9          Defendant argues the evidence in this case was so "closely
   balanced, particularly on the crucial question of who discharged the rifle,"
10 that the unanswered question could have tipped the scales against him
   despite the trial court's action in striking the question and instructing the
11 jury not to speculate about the answer or to consider it for any reason.
   Contrary to defendant's claim, the evidence of his guilt was strong.  It was
12 defendant who had the motive to shoot at the victims to stop their work.  It
   was defendant who shortly before had threatened to "shoot [the workers']
13 asses if [he had] to"; it was defendant whom the victims saw holding the
   rifle soon after the shots were fired, and it was defendant whom victim
14 Mulock saw punctuate the earlier shooting by firing the rifle into the air.

15 The state court concluded that, for these reasons, there was no reasonable probability that the jury

16 would have rendered a different verdict if the misconduct had not occurred.  Because the state

17 court applied the Brecht harmless error test, this court concludes that it applied the correct federal

18 legal rules and will, therefore, review under the "unreasonable application of" standard.

19         The court finds that the state court's adjudication was not an unreasonable

20 application of federal law.  First, the state court gave prompt curative instructions.  See

21 Weitzenhoff, 35 F.3d at 1291.  This effectively neutralized any damage done by the asked, but

22 unanswered question.  Second, as discussed at length above, the evidence regarding who fired the

23 shots was not "closely balanced" as petitioner contends.

24 / / /

25 / / /

26 / / /

1      **D.      Sufficiency of the Evidence**

2              When a challenge is brought alleging insufficient evidence, federal habeas corpus

3   relief is available if it is found that, upon the record of evidence adduced at trial, viewed in the

4   light most favorable to the prosecution, no rational trier of fact could have found proof of guilt

5   beyond a reasonable doubt.  See Jackson v. Virginia, 443 U.S. 307, 319 (1979).  Under Jackson,

6   the court must review the entire record when the sufficiency of the evidence is challenged on

7   habeas.  See id.  It is the province of the jury to "resolve conflicts in the testimony, to weigh the

8   evidence, and to draw reasonable inferences from basic facts to ultimate facts."  Id.  "The question

9   is not whether we are personally convinced beyond a reasonable doubt.  It is whether rational

10  jurors could reach the conclusion that these jurors reached."  Roehler v. Borg, 945 F.2d 303, 306

11  (9th Cir. 1991).  The federal habeas court determines sufficiency of the evidence in the context of

12  the substantive elements of the criminal offense, as defined by state law.  See Jackson, 443 U.S. at

13  324 n.16.

14              Petitioner argues that there was insufficient evidence of a necessary element of the

15  firearm enhancement – a connection between verbal threats and possession or discharge of the

16  rifle.  As to this claim, the state court stated:

17              The jury found that defendant used a firearm in threatening to
            commit crimes that would result in death or great bodily injury.
18          ([California Penal Code] § 422).
              Section 422 states in pertinent part: "Any person who willfully
19          threatens to commit a crime which will result in death or great bodily injury
            to another person, with the specific intent that the statement . . . is to be
20          taken as a threat, even if there is no intent of actually carrying it out, which,
            on its fact and under the circumstances in which it is made is so
21          unequivocal, unconditional, immediate, and specific as to convey to the
            person threatened, a gravity of purpose and an immediate prospect of
22          execution of the threat, and thereby causes that person reasonably to be in
            sustained fear for his or her safety . . . shall be punished by imprisonment in
23          the county jail not to exceed one year, or by imprisonment in the state
            prison.
24              Defendant points out that the evidence shows the shooting was
            separated from the verbal threats by a period of at least four hours after the
25          confrontation.  Thus, he argues, there was insufficient evidence to establish
            a "facilitative nexus" between the firearm use ([California Penal Code] §
26          12022.5(a)) and the underlying felonies.

1          Section 12022.5(a) stated: "Except as provided in subdivision (b),
     any person who personally uses a firearm in the commission of a felony or
2    attempted felony shall be punished by an additional and consecutive term of
     imprisonment in the state prison for 3, 4, or 10 years, unless use of a
3    firearm is an element of that offense."  Whether a defendant used a firearm
     within the meaning of section 12022.5 is a question of fact for the jury.
4    (citation omitted).

5    The state court continued by defining the elements of the underlying crimes in this case –

6    violation of California Penal Code § 422:

7          The underlying crimes in this case, violation of section 422, require
     proof that "(1) the defendant willfully threatens to kill or seriously injure
8    another person; (2) the defendant has the specific intent that the listener
     understands the statement to be a threat; (3) the threat and the
9    circumstances under which it was made lead the listener to believe the
     defendant would immediately carry through on the threat; and (4) the threat
10   causes the listener to suffer sustained fear based upon a reasonable belief
     the threat would be carried out.  (citation omitted).

11

12   The court then focused on California law regarding the sustained fear element and stated:

13         "Sustained fear" means fear which continues for "'a period of time
     that extends beyond what is momentary, fleeting, or transitory.'" (citation
14   omitted).  Thus, in determining whether a threat caused a victim to suffer
     sustained fear, a jury properly can consider an action that the defendant
15   took after the threat.  (citation omitted).  This is so because a victim might
     not take a serious threat seriously until presented with further conduct by
16   the defendant.  Accordingly "the threatening statement does not have to be
     the sole cause of the victim's fear and that a statement the victim does not
17   initially consider a threat can later be seen that way based upon a
     subsequent action taken by a defendant . . . ." (citation omitted).

18

19   The state court then discussed California cases which hold that the "surrounding circumstances"

20   can include the history of the parties' relationship and subsequent actions taken by the defendant.

21   Specifically, activities after the threat can give meaning to the words.  The court then concluded:

22         Here, two of the victims, Hawkins and Mulock, testified they did
     not take defendant's criminal threat seriously until defendant fired the
23   shots.  Thus . . . it not only was defendant's threat but subsequent action of
     firing the rifle that caused the threat to make the victims experience
24   sustained fear.  Accordingly, defendant used the firearm in the commission
     of the criminal threats because he "'utilized the gun at least as an aid in
25   completing an essential element of the [underlying] crime . . . .'" (citation
     omitted).

26

> Because there is substantial evidence to support a finding that defendant used the gun as an aid in completing an essential element of the crime of making a criminal threat, his claim of error fails. (citation omitted).

In analyzing petitioner's sufficiency of the evidence claim in light of the substantive elements of the crime, the court finds that the state court applied the applicable rules from <u>Jackson v. Virginia</u>. Therefore, this court reviews the state court's determination under the more deferential "unreasonable application of" standard.

The question is whether the state court unreasonably applied federal legal rules in concluding that there was sufficient evidence for the firearm enhancement. As revealed by the state court's analysis, California law does not require the kind of nexus petitioner argues is required. In short, the passage of time between the initial verbal confrontation and the firing of the shots is immaterial under California law. Because the state court reached this conclusion by looking to the substantive elements of the state crime, as required by <u>Jackson</u>, this court finds that it correctly applied <u>Jackson</u>.

## IV.  CONCLUSION

Based on the foregoing, the undersigned recommends that petitioner's petition for a writ of habeas corpus be denied and that the Clerk of the Court be directed to enter judgment and close this file.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within ten days after being served with these findings and recommendations, any party may file written objections with the court.  The document should be captioned "Objections to Magistrate Judge's Findings

/ / /

/ / /

/ / /

1  and Recommendations." Failure to file objections within the specified time may waive the right

2  to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

3

4  DATED:   October 19, 2006.

5

6  _____
   **CRAIG M. KELLISON**

7  UNITED STATES MAGISTRATE JUDGE

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26