IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER JAMES LYNOTT, | No. CIV S-06-0595-MCE-CMK-P |
| Petitioner, | |
| vs. | AMENDED FINDINGS AND RECOMMENDATIONS |
| TOM CAREY, Warden, | |
| Respondent. | |
| _____/ | |

Petitioner, a state prisoner proceeding with counsel, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Pending before the court is petitioner's petition for a writ of habeas corpus (Docs. 1 & 3), filed on March 21, 2006, respondent's answer (Doc. 10), filed on July 5, 2006, and petitioner's reply (Doc. 11), filed on July 11, 2006.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

# I. BACKGROUND

A. **Facts**[1]

The state court recited the following facts, and petitioner has not offered any clear and convincing evidence to rebut the presumption that these facts are correct:

> *The Prosecution Case*
> Defendant and his neighbor, William Hartig, had a cordial relationship until a dispute arose between them over Hartig's plans to build a house on his property in Blue Canyon. Defendant, who worked part time for a structural and civil engineering firm, claimed that Hartig did not have the permits needed to start construction.
> Hartig hired Champion Contractors and Richard Hawkins to pour the cement footings for the new house. Hartig was at the construction site between 4:30 a.m. and 5:00 a.m. on July 28, 2001. Harlan Hamby, an employee of Interstate Concrete Pumping, arrived to deliver concrete between 6:00 a.m. and 6:15 a.m., while it was still dark. Defendant approached Hamby in a state of agitation and said, "You are not pouring today." Defendant claimed he had "red flagged" the project and pulled the building permit. Hamby explained that he was not the "big cheese," and defendant began to calm down. However, when other crew members arrived, defendant yelled and screamed, accusing them of "bootlegging concrete." Hartig attempted to talk with defendant.
> Cement contractor Hawkins, who was a large man, entered the discussion and said, "[T]his is bull crap. We're going to pour concrete." He tried to stand his ground because there was a lot of money involved in the work scheduled that day. Hawkins suggested that defendant and Hartig work out their differences later through the permit process. Defendant responded, "[Y]ou are not that big. I've took [sic] guys bigger than you before." Defendant said he could have five guys there in 30 minutes to take care of all of them. He warned, "[Y]ou don't know who you are messing with. You don't know who I'm associated with."
> According to Christopher Mulock, one of Hawkins's workers, defendant said that he was going to get people to "come over and take care of us" and threatened to "shoot [our] asses if [he had] to." Hartig recounted similar threats. At least twice, defendant said, "[D]o you have any idea what organization I belong to? Do you have a clue what organization I belong to? You are so fucked. You are from the Bay Area. Do you know what [the] number four means in the Bay Area?" Defendant took his four fingers, pointed them down to the ground, cursed Hartig again, and walked away.

---

[1] Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made by a State court shall be presumed to be correct." Petitioner bears the burden of rebutting this presumption by clear and convincing evidence. See id. These facts are, therefore, drawn from the state court's opinion(s), lodged in this court. Petitioner may also be referred to as "defendant."

   The rest of Hawkins's crew arrived and poured 150 yards of concrete that morning.  Around 9:00 a.m., Hawkins saw two men drive up to defendant's house in a white truck.  The men had a 12-pack of beer and carried open beers in their hands.
   Most of the crew, including Hawkins, took a break up the hill from the work site around 10:00 a.m., approximately four hours after the verbal confrontation with defendant.  Hartig, Hamby, Mulock, and Dean Earing remained in the foundation hole.  During the break, all of the men heard between four and 20 shots fired.  Hawkins saw tree boughs fall on the crew.  The weapon was not in the crew's line of sight, but the bullets struck the trees 15 to 20 feet above them.  Hawkins testified the shooter "did a really good job" of scaring them.
   The four men then came out of the foundation hole, walked up the road past the entrance to defendant's driveway, and joined the rest of the crew.  Hamby, Earing, and Mulock saw defendant standing with one or two other men, and testified he was holding a rifle.  Mulock saw defendant fire the gun in the air.
   Hawkins called the sheriff's department, and Deputy Sheriff Jack Houser responded.  Houser had known defendant for some time, was familiar with the property, and was aware that defendant had a felony record.  Deputy Sheriff Ryan Owens and California Highway Patrol Officer Chris Worster already were at the scene when Houser arrived.
   Deputy Houser asked dispatch to telephone defendant's house.  Defendant then came outside accompanied by Christopher Klitgaard.  Defendant told Houser that he confronted the foreman and questioned the permits when the machinery awakened him earlier in the day.  He denied shooting a gun and suggested that local kids had done it.  Klitgaard volunteered that he had fired the gun and concealed it in the house.  Houser warned Klitgaard that he might be subject to criminal prosecution.
   Defendant's wife, Pamela, came out of the house and told Deputy Houser that she heard shots from the laundry room but did not see anyone fire a gun.  At Houser's request, she went back inside and retrieved a .44-magnum lever-action carbine from under the living room couch.  John Feurstenberger came out of the house with her.
   Once Deputy Houser learned from witnesses that defendant had been in possession of the rifle, he placed him under arrest.  Houser searched unsuccessfully for spent cartridges.  There were no usable fingerprints on the rifle.

*The Defense Case*

   Both defendant and his wife, Pamela, testified at trial.
   Pamela said that she was awakened at 4:47 a.m. on July 28, 2001, by the headlights of what she assumed was a logging truck.  She found defendant on the couch where he had gone to sleep watching television.
   Defendant and Pamela went outside and saw Hartig emerging from the entrance to the construction pit.  When defendant asked what he was doing, Hartig replied he was going to pour a foundation.  Defendant challenged Hartig's right to proceed, citing a correction notice dated 10 days earlier that had not been corrected.

/ / /

According to Pamela, Hawkins told them he had no permits, he did not need one, and he planned to pour the concrete whether they liked it or not. Hawkins stepped forward as if to bully defendant, and defendant became agitated for the first time. He told Hawkins, "[Y]ou don't know who I am or who I work with. I know practically everybody in the county." He made to reference to the number four.

Defendant and his wife then returned to the house. Pamela wanted to call the sheriff's department, but she and defendant decided it best to deal with the situation the following Monday. Defendant knew the sheriff would not get involved in a dispute over a building permit. Pamela started doing laundry and defendant went back to sleep. The couple planned to go to the Boomtown buffet or the swap meet at Denio's with Klitgaard and Feurstenberger later in the day.

Klitgaard and Feurstenberger arrived at defendant's home between 9:00 a.m. and 9:30 a.m. They spoke with defendant and Pamela for about 20 minutes. At that point, they went outside to smoke while Pamela continued with household chores and defendant took a shower. Klitgaard often went to garage sales, flea markets, and swap meets. He brought with him a rifle that he had recently purchased. Defendant and Pamela were still busy, so Klitgaard retrieved the rifle from his car and loaded it for target practice. Klitgaard put seven rounds in the magazine and one in the chamber. He fired over an abandoned house at some trees. Hawkins's crew was approximately 90 degrees to the right of where he fired.

Feurstenberger was standing next to Klitgaard when he fired the rifle. The cartridge door jammed after the first round. Klitgaard fixed the jam with a screwdriver supplied by defendant, and fired off the rest of the rounds. Not wanting to damage the firearm more, Klitgaard left it on the porch ant went inside. When the sheriff's deputies arrived and asked defendant to come outside, Klitgaard brought the rifle into the house and put it under the couch.

Defendant and Pamela heard the shots from inside the house. Defendant went outside when his friends called him, and he showed them where he kept his tools. Defendant denied handling the gun. He testified that in order to protect his friends, he told Deputy Houser that kids must have done the shooting.

Roger Dunscombe, a neighbor of defendant's, testified he was at home when the heavy equipment arrived. Later in the morning, he heard shooting and looked outside. He saw two men, one holding a gun pointed at the trees. Neither of the men was defendant.

*Prosecution Rebuttal*

Deputy Houser testified regarding statements made to him by Feurstenberger and Klitgaard. Feurstenberger said that he was not the person who shot the rifle, that he heard the shots, but that he did not see who possessed the gun or fired it. Klitgaard said that he hid the gun under the couch because "he didn't want [defendant] to get in trouble."

An investigator from the Placer County District Attorney's Office testified that he interviewed Klitgaard, who admitted firing the gun while defendant and Feurstenberger were watching. Klitgaard also said that defendant got the screwdriver to fix the gun.

4

### B. Procedural History

Petitioner was convicted following a jury trial of: three counts of threatening to commit a crime resulting in death or great bodily injury on Christopher Mulock, William Hartig, and Richard Hawkins; one count of being a felon in possession of a firearm; and one count of discharging a firearm with gross negligence. The jury also found true the allegation that petitioner had used a firearm in the commission of the offenses. Petitioner was sentenced to 14 years and 4 months in state prison.

On direct appeal, petitioner argued: (1) there was insufficient evidence to show that he had used a firearm in the commission of the criminal threats; (2) the prosecutor committed misconduct by informing the jury that petitioner had previously been convicted of assault; (3) the trial court improperly excluded evidence of the caliber of bullets recovered by defense investigators; (4) consecutive sentencing violated California law; and (5) the enhancement must be stricken. The conviction and sentence were affirmed in a decision issued on February 9, 2005. The California Supreme Court denied review without citation or comment on May 18, 2005. On March 9, 2005, petitioner filed a petition for a writ of habeas corpus in the California Supreme Court, arguing ineffective assistance of trial counsel. That petition was denied without comment or citation on February 22, 2006.

## II. STANDARDS OF REVIEW

Because this action was filed after April 26, 1996, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively applicable. See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct. (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998). The AEDPA does not, however, apply in all circumstances. When it is clear that a state court has not reached the merits of a petitioner's claim, because it was not raised in state court or because the court denied it on procedural grounds, the AEDPA deference scheme does not apply and a federal

1  habeas court must review the claim de novo.  See Pirtle v. Morgan, 313 F.3d 1160 (9th Cir.
2  2002) (holding that the AEDPA did not apply where Washington Supreme Court refused to reach
3  petitioner's claim under its "relitigation rule"); see also Killian v. Poole, 282 F.3d 1204, 1208
4  (9th Cir. 2002) (holding that, where state court denied petitioner an evidentiary hearing on
5  perjury claim, AEDPA did not apply because evidence of the perjury was adduced only at the
6  evidentiary hearing in federal court); Appel v. Horn, 250 F.3d 203, 210 (3d Cir.2001) (reviewing
7  petition de novo where state court had issued a ruling on the merits of a related claim, but not the
8  claim alleged by petitioner).  When the state court does not reach the merits of a claim,
9  "concerns about comity and federalism . . . do not exist."  Pirtle, 313 F. 3d at 1167.

10         Where the AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d)
11  is not available for any claim decided on the merits in state court proceedings unless the state
12  court's adjudication of the claim:

13         (1) resulted in a decision that was contrary to, or involved an
    unreasonable application of, clearly established Federal law, as determined
14         by the Supreme Court of the United States; or

15         (2) resulted in a decision that was based on an unreasonable
    determination of the facts in light of the evidence presented in the State
16         court proceeding.

17  28 U.S.C. § 2254(d); see also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v.
18  Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F. 3d 1223, 1229 (9th Cir. 2001).

19         Under § 2254(d), federal habeas relief is available where the state court's decision
20  is "contrary to" or represents an "unreasonable application of" clearly established law.  In
21  Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a majority of the
22  Court), the United States Supreme Court explained these different standards.  A state court
23  decision is "contrary to" Supreme Court precedent if it is opposite to that reached by the Supreme
24  Court on the same question of law, or if the state court decides the case differently than the
25  Supreme Court has on a set of materially indistinguishable facts.  See id. at 405.  A state court
26  decision is also "contrary to" established law if it applies a rule which contradicts the governing

law set forth in Supreme Court cases.  See id.  In sum, the petitioner must demonstrate that Supreme Court precedent requires a contrary outcome because the state court applied the wrong legal rules.  Thus, a state court decision applying the correct legal rule from Supreme Court cases to the facts of a particular case is not reviewed under the "contrary to" standard.  See id. at 406. If a state court decision is "contrary to" clearly established law, it is reviewed to determine first whether it resulted in constitutional error.  See Benn v. Lambert, 293 F.3d 1040, 1052 n.6 (9th Cir. 2002).  If so, the next question is whether such error was structural, in which case federal habeas relief is warranted.  See id.  If the error was not structural, the final question is whether the error had a substantial and injurious effect on the verdict, or was harmless.  See id.

State court decisions are reviewed under the far more deferential "unreasonable application of" standard where it identifies the correct legal rule from Supreme Court cases, but unreasonably applies the rule to the facts of a particular case.  See id.; see also Wiggins v. Smith, 123 S.Ct. 252 (2003).  While declining to rule on the issue, the Supreme Court in Williams, suggested that federal habeas relief may be available under this standard where the state court either unreasonably extends a legal principle to a new context where it should not apply, or unreasonably refused to extent that principle to a new context where it should apply.  See Williams, 529 U.S. at 408-09.  The Supreme Court has, however, made it clear that a state court decision is not an "unreasonable application of" controlling law simply because it is an erroneous or incorrect application of federal law.  See id. at 410; see also Lockyer v. Andrade, 123 S.Ct. 1166, 1175 (2003).  An "unreasonable application of" controlling law cannot necessarily be found even where the federal habeas court concludes that the state court decision is clearly erroneous.  See Lockyer, 123 S.Ct. at 1175.  This is because ". . . the gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."  Id.  As with state court decisions which are "contrary to" established federal law, where a state court decision is an "unreasonable application of" controlling law, federal habeas relief is nonetheless unavailable if the error was non-structural and harmless.  See Benn,

283 F.3d at 1052 n.6.

The "unreasonable application of" standard also applies where the state court denies a claim without providing any reasoning whatsoever. See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 233 F.3d 976, 982 (9th Cir. 2000).  Such decisions are considered adjudications on the merits and are, therefore, entitled to deference under the AEDPA.  See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 233 F.3d at 982. The federal habeas court assumes that state court applied the correct law and analyzes whether the state court's summary denial was based on an objectively unreasonable application of that law.  See Himes, 336 F.3d at 853; Delgado, 233 F.3d at 982.

### III.  DISCUSSION

In his petition, which was filed with the assistance of counsel, petitioner raises the following claims:

> I. The firearm use enhancements must be reversed because the record contains insufficient evidence of a connection between the verbal threats and the possession or discharge of the rifle, and therefore insufficient evidence that a firearm was used in the commission of threats of violence;
>
> II. The prosecutor committed prejudicial misconduct by eliciting petitioner's admission to a prior assault conviction on cross-examination;
>
> III. The state trial court improperly excluded evidence of the caliber of bullets recovered by defense investigators; and
>
> IV. Petitioner was denied effective assistance of counsel for failure of defense counsel to obtain expert ballistics analysis of the slugs taken from trees near petitioner's property, which would have demonstrated that the slugs were fired from Klitgaard's gun, corroborating petitioner's testimony and undermining the testimony of prosecution witnesses.

Respondent concedes these claims are exhausted.  The court will address first petitioner's claims (III and IV) relating to the underlying offense of making criminal threats.  The court will then address petitioner's claim (I and II) concerning enhancements.

/ / /

### A. Exclusion of Evidence

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of a transgression of federal law binding on the state courts. See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983). It is not available for alleged error in the interpretation or application of state law. Middleton, 768 F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986). Habeas corpus cannot be utilized to try state issues de novo. See Milton v. Wainwright, 407 U.S. 371, 377 (1972).

However, a "claim of error based upon a right not specifically guaranteed by the Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so infects the entire trial that the resulting conviction violates the defendant's right to due process." Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th Cir. 1980)); see also Lisenba v. California, 314 U.S. 219, 236 (1941). Because federal habeas relief does not lie for state law errors, a state court's evidentiary ruling is grounds for federal habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due process. See Drayden v. White, 232 F.3d 704, 710 (9th Cir. 2000); Spivey v. Rocha, 194 F.3d 971, 977-78 (9th Cir. 1999); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991); see also Hamilton v. Vasquez, 17 F.3d 1149, 1159 (9th Cir. 1994). In order to raise such a claim in a federal habeas corpus petition, the "error alleged must have resulted in a complete miscarriage of justice." Hill v. United States, 368 U.S. 424, 428 (1962); Crisafi v. Oliver, 396 F.2d 293, 294-95 (9th Cir. 1968); Chavez v. Dickson, 280 F.2d 727, 736 (9th Cir. 1960).

Petitioner claims that the trial court erred by excluding evidence of the caliber of bullets recovered by defense investigators. As to this claim, the state court stated:

> We turn now to defendant's claim that the trial court erred in excluding defense evidence regarding the caliber of a bullet recovered from trees near defendant's house.
> In November 2002, 16 months after the incident, defense investigator Lowell Carlton retrieved a rifle slug from a tree near

9

       defendant's house at a location consistent with defense testimony. When defense counsel attempted to elicit testimony on the caliber of the slug, the prosecutor objected for lack of foundation, based on the failure to show Carlton "ha[d] the ability to look at a bullet and tell you what caliber it is based on that." According to the prosecutor, "it only becomes relevant if he can say this came out of the gun here, and I have seen no foundation for the ballistics of that, either."

       The court sustained the objection because the defense had not disclosed Carlton as an expert before trial. Thereafter, the court admitted the bullet into evidence for the limited purpose of showing that Carlton dug it out of the tree.

       Defense investigator Gary Holden testified that in May 2002 he watched defendant take bullets out of the tree "that [had been] shot at." The court refused to allow those bullets to be introduced into evidence because "there [was] not a sufficient foundation in the record to provide a nexus that those slugs [were] from the gun in question or shot on the day in question."

       Defendant argues the trial court improperly excluded Carlton's testimony about the caliber of the bullet he found. Asserting that exclusion of this testimony was not an appropriate sanction for violation of reciprocal discovery in the circumstances of this case, defendant contends that the ruling violated his right to due process.

In concluding that the trial court did not err, the state court stated:

> "We review the correctness of the challenged ruling, not . . . the analysis used to reach it" . . . and conclude the court did not err in excluding Carlton's testimony.
>
> * * *
>
> Defendant is correct that violation of the reciprocal discovery statute does not ordinarily warrant exclusion of testimony at trial. (citations omitted). However, Carlton's testimony was properly excluded on the ground articulated by the prosecutor, lack of foundation. Carlton acknowledged he could only estimate the caliber of the bullet. He indicated his knowledge came from 30 years of investigative experience with the sheriff's department. The defense's failure to link the bullet that Carlton found with the rifle used in the shooting 16 months earlier justified exclusion of the testimony. Lacking that foundation, his testimony on the caliber of the bullet was not admissible.

As to the correct standard of review, it is not clear that the state court addressed the due process aspect of this claim. While it could be argued that, because the state court concluded that exclusion of the evidence was proper under state law, exclusion necessarily could not have amounted to a fundamental miscarriage of justice, nowhere in the state court's decision does the

court conclude that petitioner's due process rights were not violated.  Therefore, this court will review de novo to determine whether constitutional error has occurred.

Petitioner claims that his due process rights were violated because exclusion of Carlton's caliber testimony "was a prejudicial violation of petitioner's right to present evidence in his own behalf."  Specifically, petitioner asserts that his ability to present a defense was prejudiced by the ruling because:

> The testimony . . . that the caliber of the recovered slugs matched the caliber of Klitgaards's gun would have greatly bolstered the defense claim that these were the bullets fired on July 28, 2001.  This information would have altered the balance of credibility between defense and prosecution witnesses.  It would have helped demonstrate that the gun was fired in a direction away from the construction crew.  This would have corroborated the defense witnesses, and contradicted the prosecution witnesses, and thus would have helped demonstrate that petitioner had no direct hand in the firing of the gun.

The court disagrees.  As the state court observed, there was absolutely no link between the bullet found by Carlton with the rifle used in the shooting.[2]  Absent such a link, Carlton's testimony would not have helped petitioner's case in the way he claims.  Petitioner's version of events is that Klitgaard fired the shots from the rifle.  At best, however, Carlton's testimony would only establish that there was at least one .44 caliber bullet in the tree where Carlton found the bullet.  Even if it were stipulated that the bullet Carlton found came from the gun fired on the date of the incident, it would not establish who fired the shots, the critical issue.  Therefore, the testimony would not have bolstered petitioner's position that he did not fire the gun.

As to petitioner's contention that Carlton's testimony would have helped establish that the shots were fired away from the construction crew, the court does not agree.  Again, at best, the testimony could have established that, indeed, a shot was fired in the direction of the tree where Carlton found the bullet.  However, that does not establish that shots were not also fired in the direction indicated by prosecution witnesses.

---

[2]  Petitioner is incorrect when he states that the state court "pointed out that the bullet was not positively linked to Klitgaard's gun."

11

1    Moreover, as to petitioner's contention that Klitgaard was the shooter, during the
2 prosecution rebuttal case, Feurstenberger said that he was not the shooter, that he only heard the
3 shots but did not see who fired them.  In addition, during the defense case-in-chief, petitioner
4 testified that he was not present when the gun was fired but only heard the shots from inside the
5 house.  However, Klitgaard testified that he was standing with petitioner and Feurstenberger on
6 the porch when the shots were fired.  This directly contradicts Feurstenberger's and petitioner's
7 testimony that they did not see who fired the shots.  Carlton's testimony to the effect that a bullet
8 was found in a tree in a direction away from the construction crew would not have rehabilitated
9 the inconsistent testimony.

10    Finally, the record is clear that, even though Carlton's testimony was not allowed,
11 petitioner was nonetheless able to present his defense that he was not the shooter.  Both Klitgaard
12 and Feurstenberger testified.  In addition, petitioner and his wife testified.  Through all this
13 testimony, petitioner had ample opportunity to present his defense.

14    For all of these reasons, the court finds that petitioner was not denied the ability to
15 present his defense by exclusion of Carlton's testimony.  Therefore, petitioner's due process
16 rights were not violated in this regard.

17    **B.    Ineffective Assistance of Counsel**

18    The Sixth Amendment guarantees the effective assistance of counsel.  The United
19 States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in
20 Strickland v. Washington, 466 U.S. 668 (1984).  First, a petitioner must show that, considering
21 all the circumstances, counsel's performance fell below an objective standard of reasonableness.
22 See id. at 688.  To this end, petitioner must identify the acts or omissions that are alleged not to
23 have been the result of reasonable professional judgment.  See id. at 690.  The federal court must
24 then determine whether, in light of all the circumstances, the identified acts or omissions were
25 outside the wide range of professional competent assistance.  See id.  In making this
26 determination, however, there is a strong presumption "that counsel's conduct was within the

wide range of reasonable assistance, and that he exercised acceptable professional judgment in all significant decisions made." Hughes v. Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

Second, a petitioner must affirmatively prove prejudice. See Strickland, 466 U.S. at 693. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id.; see also Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000). A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

As to the proper standard of review under AEDPA, this claim was raised in petitioner's state habeas petition. The state court, however, did not issue a reasoned opinion when it denied this claim. Rather, it denied without comment or citation. Therefore, the court will conduct an independent review of the record to determine whether the state court's decision is based on an objectively unreasonable application of federal law. See Himes, 336 F.3d at 853; Delgado, 233 F.3d at 982.

Petitioner claims that his trial counsel was ineffective because he failed to obtain expert ballistics analysis. In response to this claim, respondent's argument, in its entirety, is:

> As to the related claim of ineffectiveness for not testing the bullets to meet the foundational objection, this must be judged under the familiar Strickland standard. Under this test, petitioner must show both that counsel's conduct fell below an objective standard of reasonableness and that petitioner was prejudiced by counsel's conduct. Strickland v. Washington, 466 U.S. 668, 687 (1984). Petitioner cannot meet the heavy burden imposed by Strickland. The independent evidence of petitioner's guilt of the charged offenses was strong. He had motive to shoot at the victims to stop their work and had threatened to shoot them before the shots

> were fired. The victims also testified to seeing petitioner with the weapon in question. Petitioner's main defense was that he did not possess or shoot the weapon at all, the direction of the bullets was not crucial to the case.

The court agrees with respondent that there is no prejudice. Petitioner argues that ballistics analysis would have established a link between the slugs recovered from the scene and Klitgaard's gun. Even so, ballistics analysis would not have established who fired the gun, which is the critical question. Petitioner also contends that ballistics analysis would have showed that the gun was fired in a different direction than described by prosecution witnesses. However, as discussed above, while such an analysis might have established that the gun was fired in a different direction, it would not have established that the gun was not also fired in the direction of the construction crew. Given the inconsistencies in the testimony of defense witnesses (as discussed above), the victims' testimony that they saw petitioner holding the rifle, and the lack of probative value to ballistics analysis, the court finds that petitioner was not prejudiced and, therefore, did not receive ineffective assistance of counsel.

### C. Prosecutorial Misconduct

Success on a claim of prosecutorial misconduct requires a showing that the conduct so infected the trial with unfairness as to make the resulting conviction a denial of due process. See Greer v. Miller, 483 U.S. 756, 765 (1987). The conduct must be examined to determine "whether, considered in the context of the entire trial, that conduct appears likely to have affected the jury's discharge of its duty to judge the evidence fairly." United States v. Simtob, 901 F.2d 799, 806 (9th Cir. 1990). Even if an error of constitutional magnitude is determined, such error is considered harmless if the court, after reviewing the entire trial record, concludes that the alleged error did not have a "substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 638 (1993). Error is deemed harmless unless it "is of such a character that its natural effect is to prejudice a litigant's substantial rights." Kotteakos v. United States, 328 U.S. 750, 760-761 (1946). Depending on the case, a prompt and effective admonishment of counsel or curative instruction from the trial judge

14

may effectively "neutralize the damage" from the prosecutor's error.  United States v. Weitzenhoff, 35 F.3d 1275, 1291 (9th Cir. 1993) (citing Simtob, 901 F.2d at 806).

Petitioner claims that the prosecutor engaged in misconduct by attempting to get him to admit to a prior assault conviction on cross-examination.  As to this claim, the state court stated:

> We begin with defendant's contention that the prosecutor committed prejudicial misconduct during cross-examination of defendant by trying to elicit evidence concerning the nature of his prior felony conviction.
> Among other things, defendant was charged with having a prior conviction for a serious or violent felony, namely, a violation of [California Penal Code] section 245(a)(1), assault with a deadly weapon or instrument other than a firearm or by means likely to produce great bodily injury.  He also was charged with being a convicted felon in possession of a firearm. (citation omitted).
> Before trial, the parties stipulated that "defendant will admit the strike prior alleged against him in the Information" and "admit that he . . . therefore may not possess a firearm under California law."  Defendant agreed to the stipulation on the condition that, if convicted, he "retain[ed] the right" to ask the court to strike the prior conviction finding for purposes of sentencing.  Out of the jury's presence, defendant waived his rights with respect to the felony conviction allegation and admitted that "on or about October 14, 1987, [he was] convicted of a 245(a)(1) violation of the Penal Code as a strike[.]"
> During cross-examination before the jury, defendant admitted he was a convicted felon.  The prosecutor then asked defendant if the "charge [he was] convicted of in 1987 was assault with a deadly weapon."  Defense counsel objected before defendant answered.  The court sustained the objection.  When the prosecutor stated, "I do not believe that piece of evidence was excluded for purposes of impeachment," the court responded, "Sustained.  Stricken."  Later, the jurors were instructed as follows: "Statements made by the attorneys during the trial are not evidence. . . . [¶] If an objection was sustained to a question don't guess what the answer might have been. . . . [¶] Don't assume to be true any insinuation suggested by a question asked a witness. [¶] . . . [¶] Don't consider for any purpose . . . any evidence that was stricken by the Court.  Treat [it] as though you had never hear of it."

The court began its analysis by concluding that it agreed with petitioner's interpretation of the stipulation.  Specifically, the state court stated that "the only reasonable interpretation of the stipulation is that the nature of the conviction [for felony assault with a deadly weapon] would not be revealed to the jury for any reason."  The court, however, concluded that reversal was not

required:

> To prevail on his claim of prosecutorial misconduct, defendant must show that it is reasonably probable a result more favorable to him would have occurred absent the prosecutor's question. (citations omitted). His argument in this respect is unconvincing.
>
> According to defendant, the question conveyed to the jurors was that he had been convicted of assault with a deadly weapon in 1987, which was almost 14 years before the events at issue in this case. But defendant never answered the question, and the trial court not only struck the question but later (1) instructed the jurors that questions are not evidence, (2) admonished them not to guess what an answer might have been if an objection was sustained, (3) told them not to assume to be true any insinuation suggested by a question, and (4) directed them not to consider for any purpose any evidence that was stricken by the court. We presume the jurors followed these instructions. (citation omitted).
>
> Defendant argues the evidence in this case was so "closely balanced, particularly on the crucial question of who discharged the rifle," that the unanswered question could have tipped the scales against him despite the trial court's action in striking the question and instructing the jury not to speculate about the answer or to consider it for any reason. Contrary to defendant's claim, the evidence of his guilt was strong. It was defendant who had the motive to shot at the victims to stop their work. It was defendant who shortly before had threatened to "shoot [the workers'] asses if [he had] to"; it was defendant whom the victims saw holding the rifle soon after the shots were fired, and it was defendant whom victim Mulock saw punctuate the earlier shooting by firing the rifle into the air.

The state court concluded that, for these reasons, there was no reasonable probability that the jury would have rendered a different verdict if the misconduct had not occurred. Because the state court applied the Brecht harmless error test, this court concludes that it applied the correct federal legal rules and will, therefore, review under the "unreasonable application of" standard.

The court finds that the state court's adjudication was not an unreasonable application of federal law. First, the state court gave prompt curative instructions. See Weitzenhoff, 35 F.3d at 1291. This effectively neutralized any damage done by the asked, but unanswered question. Second, as discussed at length above, the evidence regarding who fired the shots was not as "closely balanced" as petitioner contends.

///

///

///


### D. **Sufficiency of the Evidence**

When a challenge is brought alleging insufficient evidence, federal habeas corpus relief is available if it is found that, upon the record of evidence adduced at trial, viewed in the light most favorable to the prosecution, no rational trier of fact could have found proof of guilt beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979). Under Jackson, the court must review the entire record when the sufficiency of the evidence is challenged on habeas. See id. It is the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Id. "The question is not whether we are personally convinced beyond a reasonable doubt. It is whether rational jurors could reach the conclusion that these jurors reached." Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991). The federal habeas court determines sufficiency of the evidence in the context of the substantive elements of the criminal offense, as defined by state law. See Jackson, 443 U.S. at 324 n.16.

Petitioner argues that there was insufficient evidence of a necessary element of the firearm enhancement – a connection between verbal threats and possession or discharge of the rifle. As to this claim, the state court stated:

> The jury found that defendant used a firearm in threatening to commit crimes that would result in death or great bodily injury. ([California Penal Code] § 422).
> Section 422 states in pertinent part: "Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its fact and under the circumstances in which it is made is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her safety . . . shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison."
> Defendant points out that the evidence shows the shooting was separated from the verbal threats by a period of at least four hours after the confrontation. Thus, he argues, there was insufficient evidence to establish a "facilitative nexus" between the firearm use ([California Penal Code] § 12022.5(a)) and the underlying felonies.

> Section 12022.5(a) states: "Except as provided in subdivision (b), any person who personally uses a firearm in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for 3, 4, or 10 years, unless use of a firearm is an element of that offense." Whether a defendant used a firearm within the meaning of section 12022.5 is a question of fact for the jury. (citation omitted).

The state court continued by defining the elements of the underlying crimes in this case – violation of California Penal Code § 422:

> The underlying crimes in this case, violation of section 422, require proof that "(1) the defendant willfully threatens to kill or seriously injure another person; (2) the defendant has the specific intent that the listener understands the statement to be a threat; (3) the threat and the circumstances under which it was made lead the listener to believe the defendant would immediately carry through on the threat; and (4) the threat causes the listener to suffer sustained fear based upon a reasonable belief the threat would be carried out. (citation omitted).

The court then focused on California law regarding the sustained fear element and stated:

> "Sustained fear" means fear which continues for "'a period of time that extends beyond what is momentary, fleeting, or transitory.'" (citation omitted). Thus, in determining whether a threat caused a victim to suffer sustained fear, a jury properly can consider an action that the defendant took after the threat. (citation omitted). This is so because a victim might not take a serious threat seriously until presented with further conduct by the defendant. Accordingly "the threatening statement does not have to be the sole cause of the victim's fear and that a statement the victim does not initially consider a threat can later be seen that way based upon a subsequent action taken by a defendant . . . ." (citation omitted).

The state court then discussed California cases which hold that the "surrounding circumstances" can include the history of the parties' relationship and subsequent actions taken by the defendant. Specifically, activities after the threat can give meaning to the words. The court then concluded:

> Here, two of the victims, Hawkins and Mulock, testified they did not take defendant's criminal threat seriously until defendant fired the shots. Thus . . . it not only was defendant's threat but subsequent action of firing the rifle that caused the threat to make the victims experience sustained fear. Accordingly, defendant used the firearm in the commission of the criminal threats because he "'utilized the gun at least as an aid in completing an essential element of the [underlying] crime . . . .'" (citation omitted).

18

> Because there is substantial evidence to support a finding that defendant used the gun as an aid in completing an essential element of the crime of making a criminal threat, his claim of error fails. (citation omitted).

In analyzing petitioner's sufficiency of the evidence claim in light of the substantive elements of the crime, the court finds that the state court applied the applicable rules from <u>Jackson v. Virginia</u>. Therefore, this court reviews the state court's determination under the more deferential "unreasonable application of" standard.

The question is whether the state court unreasonably applied federal legal rules in concluding that there was sufficient evidence for the firearm enhancement. As revealed by the state court's analysis, California law does not require the kind of nexus petitioner argues is required. In short, the passage of time between the initial verbal confrontation and the firing of the shots is immaterial under California law. Because the state court reached this conclusion by looking to the substantive elements of the state crime, as required by <u>Jackson</u>, this court finds that it correctly applied <u>Jackson</u>.

### IV.  CONCLUSION

Based on the foregoing, the undersigned recommends that petitioner's petition for a writ of habeas corpus be denied and that the Clerk of the Court be directed to enter judgment and close this file.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within 20 days after being served with these findings and recommendations, any party may file written objections with the court. The document should be captioned "Objections to Magistrate Judge's Findings

///

///

///

and Recommendations." Failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: November 1, 2006.

                                          **CRAIG M. KELLISON**
                                          UNITED STATES MAGISTRATE JUDGE